UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESIGN DATA CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>UNIGATE ENTERPRISE, INC., et al.,<br><br>    Defendants. | Case No. 12-cv-04131-WHO<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 75, 104 |

The central issue on this motion for summary judgment is whether defendants can be liable for copyright infringement when there is no evidence that defendants copied or used plaintiff's copyrighted software other than having downloaded (but not installed) a copy of the software onto an external hard drive. To insure that plaintiff had ample opportunity to prove its case, I delayed the hearing on this motion for several months, allowed extensive discovery, and considered supplemental briefing. Because I find that the evidence demonstrates only *de minimis* copying, defendants' motion for summary judgment must be GRANTED.

## BACKGROUND

Plaintiff Design Data Corporation created and owns copyrighted structural steel detailing software called SDS/2. Declaration of Barry Butler (Docket No. 85-11) ¶ 2. SDS/2 is a computer aided design (CAD) software that can produce two and three dimensional drawings and models of structural steel components. These drawings and models support the design, detailing, fabrication, and erection of structural steel in buildings and other structures. *Id*. ¶ 4. SDS/2 drawings and models can only be viewed: (1) with the SDS/2 software; (2) with the "SDS/2 Viewer" software; and (3) in electronic images (and printed versions) exported from SDS/2 (e.g., .pdf or .tiff files). *Id*. ¶ 3. When SDS/2 is used to design a steel component, the software generates a directory of folders, called "job files" that contain all information and files related to a project, including text

files detailing errors and instructions to correct errors. *Id*. ¶ 8.

Defendants Louis Liu and Helen Zhang are co-owners of defendants Unigate Enterprise, Inc. (UE) and Unigate Graphic, Inc. (UG). Declaration of Helen Zhang (Docket No 75-1), ¶ 1.[1] UE's business is providing steel detailing CAD files to customers. *Id*. ¶ 3. Defendants contend that UE does not do the steel detailing itself, but acts as a "middle-man" between Chinese contractors and clients in the United States. *Id*. UG does business as Deluxe 3D and provides architectural 3D rendering pictures, also made by contractors in China, to its customers. *Id*. ¶ 4.

Defendants assert they have never used SDS/2 and simply act as intermediaries between contractors in China and clients in the United States. They admit, however, that they told clients they "could do" steel detailing using SDS/2 and represented that they had offices in China, but in reality they outsourced the work to others in China. Zhang Decl. ¶ 14; Zhang Supplemental Declaration in Support of Reply (Docket No.104-8), ¶ 6; *see also* Duden Decl. ¶ 8 (email from Zhang explaining detailing work on Hurst Middle School project was done in Unigate's "Shanghai office"), ¶ 11 (email from Zhang stating that Unigate "can do show [sic] drawings by using SDS/2.").

Defendants do not dispute that SDS/2 appears to have been used to create drawings and images for five of UE's projects, but UE contends that the work was actually done in China. Zhang Decl. ¶ 11. Defendants also admit that they forwarded files containing 2D and 3D drawings and models created with SDS/2 to clients and prospective clients – but assert that they did not use SDS/2 themselves. Zhang Decl. ¶ 12; Zhang Supp. Decl. ¶¶ 8-9; Duden Decl. ¶ 7.[2]

Defendants admit that Helen Zhang downloaded a copy of SDS/2 to an external hard drive. The parties dispute the purpose and circumstances surrounding that download. DDC contends that Zhang admitted that she paid to download a "cracked" copy of the software, but that she was

---

[1] DDC moves to strike various portions of the Zhang Declaration. Docket No. 85-3 at pgs. 19-22. The objections to page 1 lines 6-8, 15-16, 18-20, 20-21; page 2 lines 14-15, 16-19, 23-25, 25-26, 26-27; page 3 lines 13-15, 16-19, 18-20, 20-21, 23 are OVERRULED. The Court need not address the objections to page 2 lines 21-23, 23-25; page 2, line12 and Exhibits A-C because the Court does not rely on those statements and exhibits in deciding this motion.

[2] The parties dispute whether Zhang volunteered to provide the files of drawings and models created using SDS/2 or whether DDC's represented requested these and Zhang agreed to provide them in response to that specific request. *Compare* Duden Decl. ¶ 7 *with* Zhang Supp. Decl. ¶ 9.

unable to make it work.  Duden Decl. ¶ 14.  Zhang asserts that she downloaded a free demonstration copy of SDS/2 from the internet, which she assumed was a legitimate copy, in order to learn "what the software was all about," but did not install it or try to use it.  Zhang Decl. ¶¶ 9, 10, 14; Zhang Supp. Decl. ¶ 7.

DDC has not sold a license for SDS/2 to any of the defendants.  Based on their investigations (including viewing materials on UE's website and project files), DDC believed that UE was using SDS/2 without a license.  Duden Decl. ¶¶ 6-11.  Representatives of DDC visited UE on August 7, 2012 to confront defendants.  Defendants allowed DDC's representatives to search their computers and copy files.  Duden Decl. ¶ 12; Zhang Decl. ¶ 14.  As part of this search, DDC found a folder containing installation files for SDS/2 and three patch files which enable a user to circumvent SDS/2's licensing requirement, including a file called 1-sds2633crk.exe.  Duden Decl. ¶ 15.

In July 2013, UE's counsel hired an expert from Setec to make forensic images of its computer hard drives.  Declaration of Michael Kunkle (Docket No. 75-3), ¶ 6.  That inspection revealed a single reference to SDS/2 on a computer and a copy of SDS/2 on an external hard drive ("G drive").  *Id*.  The reference on the computer was in an antivirus log, showing that the SDS/2 copy was located on the external hard drive.  *Id*.  Setec found no evidence that the SDS/2 software ever existed or was installed on the computer.  *Id*. ¶ 7.  Examining the copy of SDS/2 on the external hard drive, Setec determined it was still in its original form and found no evidence that the software was ever installed or unpacked on the external drive.  *Id*. ¶ 8; Supplemental Declaration of Michael Kunkle (Docket No. 102), ¶¶ 5-6.

Defendants filed their initial motion for summary judgment in January 2014.  Docket No. 63.  The Court granted plaintiff's request to continue the hearing on the summary judgment motion and continue the trial dates to allow plaintiff to take discovery from defendants.  Docket No. 73.  Defendants filed their renewed motion for summary judgment in March 2014.  Docket No. 75.  At plaintiff's request, the Court again continued the summary judgment briefing and hearing dates to allow plaintiff to conduct additional forensic inspections of the defendants' computers.  Docket No. 81.

In April 2014, DDC's expert from IBridge LLC, Joel Brillhart, created forensic images of defendants' computers and also reviewed the forensic copies made by Setec. Declaration of Joel Brillhart (Docket No. 85-12), ¶ 5. Brillhart was not able to locate or recover a copy of the file "1-sds26336crk.exe" which was found by DDC representatives in August 2012. Brillhart Decl. ¶ 6. However, Mr. Brillhart found a reference to that specific file as being located on Zhang's G drive and "quarantined" by an antivirus software program. *Id*. ¶¶ 7a-e. Brillhart states that because he was unable to locate a copy of the 1-sds2633crk.exe file, he concludes that the file must have been purposefully and permanently removed from Zhang's G drive. *Id*. ¶ 10. Brillhart also located a file suggesting that a file titled sds2.exe could be found on Zhang's G drive. *Id*. ¶¶ 7f-g. Brillhart was also unable to locate any evidence suggesting the SDS Viewer program was ever saved or located on any of UE's devices. *Id*. ¶ 11.

Defendants have moved for summary judgment arguing that UE and its principals cannot be held liable for direct infringement of DDC's copyright in SDS/2 because the mere act of downloading (and not installing or using) a copy of SDS/2 is at most *de minimis* copying protected under the Copyright Act. Defendants also argue that UE cannot be liable for contributory infringement for any alleged use of SDS/2 by it contractors in China. Finally, defendants assert that summary judgment should be granted for UG, as that entity plays no role in the steel detailing at issue.

### LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate specific facts showing a genuine issue for trial." *Id*. at 324 (quotation marks omitted).

To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I. CONTRIBUTORY INFRINGEMENT

Defendants move for summary judgment on DDC's contributory infringement claim. They argue, correctly that a company in the United States cannot be found liable for contributory copyright infringement for authorizing or collaborating with someone that infringes a copyrighted work in a foreign country. *See, e.g., Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1092, 1995 (9th Cir. 1994) ("wholly extraterritorial acts of infringement cannot support a claim under the Copyright Act" even when "authorized" by a party in the United States). DDC did not address this issue in its opposition and presents no evidence that any of the steel detailing work (creation of drawings and images) provided by defendants to clients in the United States was actually done in the United States. Accordingly, summary judgment is GRANTED to defendants

1 on DDC's contributory infringement claim.

2 **II. DIRECT INFRINGEMENT**

3 In opposing defendants' motion, DDC has two arguments that defendants can be liable for direct infringement and asserts that it has raised material issues of fact on both. First, DDC contends that defendants' importation into the United States of files and images generated by SDS/2 in China violated the Copyright Act, 17 U.S.C. § 602. Second, DDC asserts that defendants' copying SDS/2 onto their external hard drive violated the Copyright Act and did not constitute *de minimis* copying as a matter of law. I will address each argument in turn.

**A. Copying of SDS/2 Files and Images**

DDC argues that when defendants received the "job files" and images created by its contractors in China, defendants violated the Copyright Act because those files and images constitute a copy or copyrighted portion of SDS/2. Oppo. at 14. It is undisputed that defendants had on their computers: (1) one or more electronic images containing 2D drawings generated with SDS/2; (2) one or more electronic images of 3D models generated with SDS/2; (3) multiple text files generated by SDS/2 during its operation that constitute error logs containing user error reports and DDC instructions regarding those errors; and (4) entire directories of folders generated by SDS/2 ("job files") which contain all information related to the design of structural steel components with SDS/2 in association with two of UE's projects. *Id*. DDC contends that these files and electronic images are covered under the SDS/2 copyright registration because they are the *output* of the SDS/2 program, and that it has raised a material issue of fact as to whether the output "contain expression that is protected under the SDS/2 Copyright Registration." Oppo. at 15.[3]

The question here, of course, is not whether the output at issue is expressive so that it is *copyrightable*, but whether the copyright registration on the software is broad enough to protect the program's outputted files and drawings. DDC relies on a number of cases that are inapposite.

DDC relies first on *AtPac, Inc. v. Aptitude Solutions, Inc.*, 787 F. Supp. 2d 1108 (E.D. Cal.

---

[3] The SDS/2 copyright is for a "computer file." Declaration of James Li (Docket No. 103), Ex. N. In other words, it is a literary work under 17 U.S.C. § 102(a)(1).

2011). The *AtPac* court recognized the well-established principle that computer programs are entitled to copyright protection as "literary works" (under 17 U.S.C. § 102(a)) and went onto explain that "[p]rotection under the Copyright Act extends to both 'literal' and 'non-literal' components of computer software. . . . Literal components include source codes and object codes and non-literal components include the software's structure, organization, and user interface."[4] *Id*. at 1114. That case does *not* stand for the proposition that the output of a software program, here the job files and drawings, are covered by the program's copyright.

In *Miller v. Facebook, Inc*., 2010 U.S. Dist. LEXIS 75204, *5 (N.D. Cal. July 23, 2010), the court simply clarified a prior order and found that plaintiff's work would be analyzed as a literary work (copyrighted under 17 U.S.C. § 102(a)(1)) and not an audio-visual work (copyrighted under § 102(a)(6)). The court did not determine whether the audio-visual "look and feel" elements of the program were protected. Here, it is not the "look and feel" of the SDS/2 program that DDC accuses defendants of copying into another software program, but instead the output of that program.

DDC also relies on *Atari Games Corp. v. Nintendo of Am*., 1993 U.S. Dist. LEXIS 8183 (N.D. Cal. Apr. 15, 1993). That case draws a distinction between the source code that operates the program (and is protected by the copyright) and the output data (which is not protected by the copyright). As the court explained:

> 17 U.S.C. § 101 provides that, "A 'computer program' is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." This Congressional definition indicates that protection for computer programs includes program instructions, or the software code that tells the microprocessor what to do, but not program data which is stored somewhere in memory and often changes as the program instructions are being executed by the microprocessor. The program data is the result sought by execution of the program instructions. Thus, the statements that manipulate the data would fall within the statutory definition, while the data that result from those calculations

---

[4] As explained in *Johnson Controls, Inc. v. Phoenix Control Systems, Inc*., 886 F.2d 1173, 1175 (9th Cir. 1989), another case relied upon by DDC, "[t]he user interface, also called the 'look and feel' of the program, is generally the design of the video screen and the manner in which information is presented to the user."

United States District Court
Northern District of California

would not.

*Id*. at *11-12.

Here the "job files" and other documents produced by the program are "data" not covered by the program's copyright. With respect to the drawings produced from SDS/2, those might be copyrightable but they are not automatically entitled to protection as the output of SDS/2.[5] As explained in *Computer Assocs. Int'l v. Altai*, 982 F.2d 693 (2d Cir. 1992):

> [O]ur decision here does not control infringement actions regarding categorically distinct works, such as certain types of screen displays. These items represent products of computer programs, rather than the programs themselves, and fall under the copyright rubric of audiovisual works. If a computer audiovisual display is copyrighted separately as an audiovisual work, apart from the literary work that generates it (i.e., the program), the display may be protectable regardless of the underlying program's copyright status. . . . . Of course, the copyright protection that these displays enjoy extends only so far as their expression is protectable.

*Id*. at 703.[6]

DDC has failed to raise a material question of fact to show that the files and images created by SDS/2 at issue were themselves protected by the SDS/2 copyright.

### B. Direct Infringement by Downloading SDS/2

Defendants do not dispute that Zhang downloaded a copy of SDS/2 to her external drive. Defendants' expert found no evidence that the program was installed or used. Kunkle Decl. ¶¶ 7-8. DDC's expert presents no testimony or evidence to the contrary. Because they never opened or

---

[5] As the *Atari* Court explained, "Cases that grant protection to program output, however, usually arise where the program instructions generate an audiovisual display; copyright protection exists only because the output itself is a proper subject for copyright, not simply because it was generated by a copyrightable software program." *Atari Games Corp. v. Nintendo of Am*., 1993 U.S. Dist. LEXIS 8183 at * 7 (citing a case discussing the separate copyrighting of a computer audiovisual display [*Computer Associates Int'l, Inc. v. Altai, Inc*., 982 F.2d 693 (2nd Cir. 1992)] and two cases which compared the "look and feel" output of computer programs to determine whether copyrighted code had been copied [*Data East, USA, Inc. v. Epyx, Inc*., 862 F.2d 204 (9th Cir. 1988); *Apple Computer, Inc. v. Microsoft Corp*., 799 F. Supp. 1006 (N.D. Cal. 1992)]). The Court need not address whether the drawings and models produced using SDS/2 are separately copyrightable forms of expression because there is no dispute that the drawings at issue were not copyrighted.

[6] The last case DDC relies on *MDY Indus., LLC v. Blizzard Entm't, Inc*., 616 F. Supp. 2d 958, 966 (D. Ariz. 2009) is also inapposite. That case (which considered an alleged violation of the Digital Millennium Copyright Act) simply recognized that audio-visual displays of computer games can be copyrighted as audio-visual works, despite the fact that users interact with and in part determine what is displayed. *See, e.g., Williams Electronics, Inc. v. Artic International, Inc*., 685 F.2d 870 (3d Cir. 1982).

used the software, defendants argue that the mere copying of the program to the drive was *de minimis* and not actionable under the Act.[7]

The Ninth Circuit has explained the concept of *de minimis* copying under the Copyright Act as: "[f]or an unauthorized use of a copyrighted work to be actionable, the use must be significant enough to constitute infringement. . . . This means that even where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial." *Newton v. Diamond*, 388 F.3d 1189, 1192-1193 (9th Cir. 2004); *see also Ringgold v. Black Entertainment TV*, 126 F.3d 70, 74 (2d Cir. 1997) (*de minimis* concept "insulates from liability those who cause insignificant violations of the rights of others."). DDC notes that whether or not copying is *de minimis* is generally a question of fact. However, that does not preclude a court from granting summary judgment where, on undisputed facts, no reasonable juror could find the downloading but not opening or using of the SDS/2 was not significant. *Newton* at 1195 (granting summary judgment to defendants).

DDC argues that because defendants copied the entire software code for SDS/2, the copying cannot be *de minimis* as a matter of law. But as defendants point out, the cases discussing *de minimis* focus on the substantial or insubstantial "use" of the copyrighted material in the copy. As the Second Circuit explained in *Ringgold v. Black Entertainment TV*, the concept of *de minimis* use encompasses "a technical violation of a right so trivial that the law will not impose legal consequences," for example a "claim based on a photograph of [the copyright holder's] product in an office copy of a display card of a competitor's product where the display card was never used." *Id*. at 74 (discussing *Knickerbocker Toy Co. v. Azrak-Hamway International, Inc.*, 668 F.2d 699, 703 (2d Cir. 1982))[8]; *see also Newton*, 388 F.3d 1189, 1192-1193 ("For an unauthorized *use* of a

---

[7] DDC is correct that "copying" of a computer program occurs each time the program is "opened without the copyright owner's authorization." Oppo. at 13. This is because "the loading of software into a computer constitutes the creation of a copy under the Copyright Act." *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 519 (9th Cir. 1993).

[8] The Court in *Ringgold* also recognized that *de minimis* "can mean that copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying" and "*de minimis* might be considered relevant to the defense of fair use" in assessing "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." *Id*. at 74-75.

1  copyrighted work to be actionable, the *use* must be significant enough to constitute infringement."
2  (emphasis added)).

3      The cases DDC relies upon describing the test for determining *de minimis* use as whether
4  an audience would "recognize" the appropriation of a protected work in another are inapposite.
5  Oppo. at 11. The unsurprising focus of those cases – which arose out of allegations of copying of
6  protected songs in a sample or parody – was on whether the audience listening to the new work
7  would recognize the original, going to the substantiality of the copying. *See Fisher v. Dees*, 794
8  F.2d 432, 434 n.2 (9th Cir. 1986); *see also Newton v. Diamond*, 388 F.3d at 1193 (discussing
9  *Fisher* as a leading case on the question of "substantial similarity, which also looks to the response
10 of the average audience, or ordinary observer, to determine whether a use is infringing.").

11     Here, the undisputed facts are that Zhang downloaded a copy of SDS/2, but did not install
12 or use it. Kunkle Decl. ¶ 8; Zhang Decl. ¶ 10; *see also* Duden Decl. ¶ 14 (Zhang admitted that she
13 had "purchased a cracked copy of SDS/2, but that she had trouble getting it to function on her
14 computer, and so she hadn't actually used any version of SDS/2 on her computer.").

15     Failing to locate any evidence of defendants' actual use of SDS/2 – despite their extensive
16 forensic efforts and having taken the depositions of defendants – DDC relies on circumstantial
17 evidence to suggest that defendants did *use* SDS/2 by pointing to statements defendants made to
18 prospective clients in emails and their contracts; that they "used" or could "produce" drawings in
19 SDS/2 and that UE "produces and delivers shop detail drawings" and "Unigate will make an effort
20 to coordinate the architectural and structural set of drawings . . . while preparing the set of Shop
21 Detail Drawings." *See, e.g.,* Declaration of Kymberleigh Korpus (Docket Nos. 85-13, 85-14), Ex.
22 2 ("We usually use SDS/2 or Xsteel to do structural part detailing"); Ex. 4 ("We are in California
23 and provide our service all over the US. We usually use SDS2 and XSteel to do detailing."); Ex.
24 15. However, given the undisputed facts regarding defendants' actual business model, which was
25 solely to act as the middleman between contractors in China and clients in the United States,
26 coupled with the lack of evidence of use, defendants' marketing pitches and statements to their
27 clients do not amount to evidence that defendants used or otherwise copied SDS/2 in any
28

United States District Court
Northern District of California

significant way.[9]

I conclude that the downloading of a copy of SDS/2 – without any evidence that the copy was installed or used – amounts at most to a *de minimis* "technical" violation that is not actionable as a matter of law. *See Ringgold*, 126 F.3d at 74.

Finally, DDC spends much time painting defendants as untrustworthy. It argues that defendants (i) refused to turn over pertinent information (emails between defendants and clients found by DDC's expert, but not produced by defendants because they may have been deleted), (ii) allegedly deleted the cracked SDS/2 file from their computer (when the forensic evidence from both sides indicates the cracked file was quarantined by an antivirus program and subsequently deleted), (iii) purchased and downloaded a cracked copy of SDS/2 in order to circumvent DDC's license (when defendants claim they downloaded what they thought was a free demonstration copy of SDS/2) and (iv) advertised that they actually used SDS/2 (but now assert they never used SDS/2).

DDC contends that these examples of defendants' behavior "give rise" to "the inference that Defendants have engaged in infringing activity that they have been trying to conceal from DDC during this litigation." Oppo. at 17; Supplemental Opposition (Docket No. 111) at 2 (arguing court cannot "resolve" disputed factual issues in defendants' favor when they "have been shown repeatedly by the evidence to be dishonest with their customers, potential customers, Plaintiff, and the Court."). However, such an inference cannot defeat defendants' motion for summary judgment. DDC had ample opportunities to find evidence that defendants' *actually* infringed its copyright in SDS/2. Having failed to do so, it cannot avoid summary judgment by attempting to undermine defendants' credibility.

### III. UG'S LIABILITY FOR UE'S INFRINGEMENT

Because the Court has GRANTED the motion for summary judgment as to UE's

---

[9] DDC also relies on UE's contracts to argue that UE disclaimed the use of subcontractors to create the detailing work. Oppo. at 8-9 (citing UE's contracts). However when read in context the contracts provide that UE cannot be considered a subcontractor or engineer to the *client*, not that UE will not use a contractor for the detailing work. *See, e.g.,* Korpus Decl., Ex. 15 ("Unigate is not acting as a subcontractor or engineer but as a service provider.").

11

1 infringement, summary judgment must likewise be granted to UG, as the substance of the

2 allegations regarding infringement are the same.

3 **IV.   DDC'S SUPPLEMENTAL OPPOSITION**

4 Per the parties' request, I gave leave to DDC to a file a supplemental opposition, based on DDC's representation that it "learned information" in the June 24 and 25 depositions of defendants that "needs to be considered by the Court in ruling on the MSJ." Docket No. 109.  In DDC's supplemental opposition, DDC cites no new facts that are directly relevant to arguments made in the motion for summary judgment.  Instead DDC provides further argument on its theory that defendants' possession and use of the output of SDS/2 (images and files) violated the copyright covering SDS/2.  For the reasons discussed above, I reject that argument.

The main focus of DDC's supplemental opposition is an argument that summary judgment should not be granted to defendants because DDC will seek leave to file an amended complaint to allege new causes of action for:

- violation of the Digital Millennium Copyright Act – based on defendants' purchase and unsuccessful attempt to use a "cracked" copy of SDS/2, *see* Proposed SAC Docket No. ¶ ¶ 27-32;
- false designation of origin – based on defendants representations to clients that the SDS/2 drawings were made in the United States, when they were really done in China, *see* Proposed SAC ¶ 37;
- common law trademark infringement and unfair competition – based on defendants' marketing of its services using the SDS/2 mark, *see* Proposed SAC ¶ 37 ; and
- statutory false advertising and unfair competition – based on defendants use of the SDS/2 mark in their advertising but not actually using or having a license to use SDS/2, based on allegedly false promises made in their advertisements, and presumably based on defendants failure to maintain "the protection of their individual or corporate statuses."

*See* Proposed SAC ¶ 33, 34, 37-44; 45-46.

The Court will address whether to grant DDC leave to amend in a separately noticed hearing.  The request to amend, however, does not prevent the Court from granting defendant's

motion for summary judgment on the existing causes of action in this case.[10]

## V. ADMINISTRATIVE MOTION TO FILE UNDER SEAL

DDC asks the Court to file under seal various portions of defendants' reply brief and supporting declarations. As discussed below, I am allowing certain portions of the documents to be filed under seal. If this case goes to trial, however, I will reconsider whether it is appropriate to prohibit public access to this evidence. I will address each in turn.

Reply 3:10-11. DDC seeks to seal one sentence describing the confidential and proprietary methods used to investigate and detect copyright infringement. The motion is GRANTED as to this sentence.

Reply 5:18. DDC seeks to seal two words that allegedly disclose a method DDC uses to investigate and detect copyright infringement. The motion is GRANTED.

Reply 13:27-14:2. DDC seeks to seal information regarding a question one of its representatives asked DDC. DDC does not explain why the information in this question would disclose a confidential method DDC employs to investigate and detect copyright infringement. The motion is DENIED.

Zhang Decl., 2:13, 3:3, 4, 6, 10, 11, 15, 18-26; 4:10:11. DDC seeks to seal information describing a confidential and proprietary method it uses to investigate and detect copyright infringement. The motion is GRANTED.

Zhang Decl., 4:12-13, 15-16, 24, 28. DDC seeks to seal this information, but DDC does not explain why the information in question would disclose a confidential method DDC employs to investigate and detect copyright infringement. The motion is DENIED.

Li Decl, Ex. J, portions of pages 3-4. DDC seeks to seal information describing a confidential and proprietary method it uses to investigate and detect copyright infringement. The motion is GRANTED.

Li Decl., Ex. O. This information is public information and DDC does not provide a

---

[10] The Amended Complaint also includes a cause of action for breach of implied contract/quantum meriut based on defendants' alleged unjust enrichment as a result of their use of SDS/2. Because this claim rests solely on the theory of copyright infringement rejected above, summary judgment is GRANTED to defendants on this cause of action as well.

reason for its sealing. The motion is DENIED.

Li Decl., Ex. P. DDC seeks to seal information describing its confidential and proprietary methods used to investigate and detect copyright infringement. The motion is GRANTED.

Li Decl., Ex. Q. DDC seeks to seal information describing a confidential and proprietary method it uses to investigate and detect copyright infringement. The motion is GRANTED.

Li Decl., Ex. T. This information is public information and DDC does not provide a reason for its sealing. The motion is DENIED.

Li Decl., Ex. U-1 and U-2. DDC seeks to seal information describing a confidential and proprietary method it uses to investigate and detect copyright infringement. The motion is GRANTED.

Within five days of the date of this Order, defendants shall filed revised (redacted as necessary) versions of the Reply brief, Supplemental Zhang Declaration and Li Decl. Ex. O and Ex. T consistent with this Order.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Court will consider entering a final judgment only after ruling on the pending motion for leave to amend.

**IT IS SO ORDERED**.

Dated: August 6, 2014

WILLIAM H. ORRICK
United States District Judge